## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PAMELA Y.,

*Plaintiff,*

vs.

KILOLO KIJAKAZI, ACTING
COMMISSIONER OF SOCIAL
SECURITY,

*Defendant.*

Case No. 2:21-cv-1082-EFM

## MEMORANDUM AND ORDER

Plaintiff Pamela Y. seeks judicial review of a final decision by Defendant, the Acting Commissioner of the Social Security Administration (the "Commissioner"),[1] denying her applications for disability insurance benefits ("SSDI") and disabled widow's benefits under Title II and supplemental security income ("SSI") under Title XVI of the of the Social Security Act ("the Act"). Having reviewed the record, the Court affirms the Commissioner's final decision for the reasons stated below.

---

[1] On July 9, 2021, Kilolo Kijakazi was named the Acting Commissioner of Social Security and has been automatically substituted as the defendant in this case. *See* Fed. R. Civ. P. 25(d).

## I.    Factual and Procedural Background

Plaintiff applied for SSDI on December 17, 2018, and for disabled widow's benefits and SSI on April 15, 2019.  Plaintiff alleged disability beginning in March 2018, when she was 48 years old, due to multiple physical and mental impairments, including but not limited to degenerative disc disease, carpal tunnel syndrome, osteoarthritis, depression, and anxiety.  After the applications were denied, Plaintiff requested a hearing before the administrative law judge ("ALJ"), which was granted.  The hearing was held in March 2020, and both Plaintiff and a vocational expert testified.

In a decision dated April 15, 2020, the ALJ determined that Plaintiff's impairment or combination of impairments, while severe, do not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found that Plaintiff has the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(c) except she can perform work involving no climbing of ladders, ropes, or scaffolds.  She can frequently climb ramps and stairs.  She can frequently stoop, kneel, and crouch, and occasionally crawl.  She can perform work allowing her to avoid all exposure to dangerous machinery (for example, machinery with unshielded blades) and unprotected heights and excessive vibration (for example, that of a jackhammer).  She can frequently handle and finger.  She can understand, remember, and carry out instructions consistent with unskilled work.

The ALJ then determined that while Plaintiff is not capable of performing past relevant work in factory production, cleaning services, and security services in a medical setting, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  Thus, the ALJ concluded that Plaintiff had not been under a disability from March 15, 2018, through the date of her decision.

Plaintiff requested review of the ALJ's decision from the Appeals Council.  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.[2] Having exhausted her administrative remedies, Plaintiff now seeks review of the ALJ's decision by this Court.

## II.     Legal Standard

Judicial review of the Commissioner's decision is guided by the Act, which provides, in part, that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."[3]   The Court must therefore determine whether the Commissioner made factual findings that are supported by substantial evidence in the record and applied the correct legal standard to those factual findings.[4]  "Substantial evidence . . . is 'more than a scintilla.'"[5]   However, "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[6]   The Court may "neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]."[7]   However, courts "also do not accept 'the findings of the commissioner' mechanically or affirm those findings 'by isolating facts and labeling them as substantial evidence, as the court[s] must scrutinize the

---

[2] 20 C.F.R. §§ 404.981, 422.210(a).

[3] 42 U.S.C. § 405(g).

[4] *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)).

[5] *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[6] *Id.* (quoting *Consol. Edison Co.*, 305 U.S. at 229) (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)).

[7] *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

entire record in determining whether the Commissioner's conclusions are rational.'"[8]  "Evidence is not substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion.'"[9]

"An individual is under a disability only if that individual can establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months."[10] This impairment "must be severe enough that she is unable to perform her past relevant work, and further cannot engage in other substantial gainful work existing in the national economy, considering her age, education, and work experience."[11]

Pursuant to the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled.[12]  The steps are designed to be followed in order.[13]  If it is determined, at any step of the process, that the claimant is or is not disabled, further evaluation is unnecessary.[14]

The first three steps of the sequential evaluation require the Commissioner to assess:  (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged

---

[8] *K.I. v. Kijakazi*, 2021 WL 4149087, at *1 (D. Kan. 2021) (alteration in original) (quoting *Alfrey v. Astrue*, 904 F. Supp. 2d 1165, 1167 (D. Kan. 2012)).

[9] *Id.* (quoting *Lawton v. Barnhart*, 121 F. App'x 364, 366 (10th Cir. 2005)).

[10] *Brennan v. Astrue*, 501 F. Supp. 2d 1303, 1306-07 (D. Kan. 2007) (citing 42 U.S.C. § 423(d); *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002)).

[11] *Barkley v. Astrue*, 2010 WL 3001753, at *2 (D. Kan. 2010) (citing *Barnhart*, 535 U.S. at 217-22); 20 C.F.R. § 416.920).

[12] *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004); *see* 20 C.F.R. § 404.1520(a)(4).

[13] *Barkley*, 2010 WL 3001753, at *2.

[14] *Id.*; *Lax*, 489 F.3d at 1084 (citing *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)).

disability; (2) whether the claimant has a severe, or combination of severe, impairments; and (3) whether the severity of those impairments meets or equals one of a designated list of impairments.[15]  If the impairment does not meet or equal one of these designated impairments, the ALJ must then determine the claimant's RFC, which is the claimant's ability "to do physical and mental work activities on a sustained basis despite limitations from her impairments."[16]

Upon determining the claimant's RFC, the Commissioner turns to steps four and five, which require the Commissioner to determine whether the claimant can either perform past relevant work or can generally perform other work that exists in the national economy, respectively.[17]  The claimant bears the burden in steps one through four to prove an impairment or combination of impairments that prevents the performance of past relevant work.[18]  The burden then shifts to the Commissioner at step five to show that, despite the claimant's alleged impairments, based on the claimant's RFC and other factors, the claimant could perform other work in the national economy.[19]

## III.    Analysis

The ALJ found that Plaintiff has the RFC to perform "light work" as defined in 20 C.F.R. § 404.1567(b) with additional postural limitations.   Plaintiff argues that the ALJ erred in determining her RFC by: (1) not providing findings on Plaintiff's abilities on a function-by-function basis when determining that she can do light work, particularly Plaintiff's ability to sit,

---

[15] *Lax*, 489 F.3d at 1084 (citations omitted).

[16] *Barkley*, 2010 WL 3001753, at *2 (citing 20 C.F.R. § 416.920(e)).

[17] *Id.* (citing *Williams*, 844 F.2d at 751).

[18] *Lax*, 489 F.3d at 1084 (quoting *Hackett*, 395 F.3d at 1171).

[19] *Id.* (quoting *Hackett*, 395 F.3d at 1171).

stand, and walk; (2) finding Plaintiff's treating physician's medical source statement unpersuasive; and (3) finding Plaintiff's subjective complaints of disabling symptoms unsupported by the record.

The Court begins with the relevant evidence before the ALJ regarding Plaintiff's impairments affecting her ability to sit, stand, and walk, and the ALJ's assessment of that evidence in her decision. Because Plaintiff claims that the ALJ only erred in failing to consider limitations on her ability to sit, stand, and walk, the Court omits discussion of Plaintiff's impairments that do not affect those functions.

## A.    Evidence Regarding Plaintiff's Neck and Back Impairments

Plaintiff underwent cervical and thoracic MRIs in March 2016, which showed mild disc bulges at C4-5 and C5-6 in the cervical spine and small disc bulges/protrusions in the mid to upper thoracic spine. On September 17, 2016, Plaintiff went to the emergency room due to increasing lower back pain over the past five days; at that time, an x-ray of the lumbar spine showed degenerative changes with no acute bony abnormality. As noted by the ALJ, in October 2017, Plaintiff's neck was normal, her lower extremity exam was normal, and her neurological exam was normal with normal motor function and normal gait. The ALJ also noted that in January 2018, Plaintiff's neck exam again revealed normal range of motion and her neurological exam showed normal motor function and gait.

The ALJ discussed Plaintiff's lumbar and thoracic x-ray imaging from April 2019, stating:

> Lumbar x-rays . . . confirmed 6 mm . . . anterolisthesis of the L4 on the L5 possibl[y] secondary to facet arthrosis but no compression deformity since the vertebral body heights were maintained. Thoracic spine x-rays showed no fracture or subluxation and only "mild" disc space narrowing and endplate formation in the mid-thoracic spine; notably, vertebral heights and alignment were maintained. Cervical spine x-rays on the same day showed no fracture or subluxation; in fact, the vertebral body heights, disc

spaces and alignment were maintained, prevertebral soft tissues were normal, and the odontoid was intact.

The ALJ further documented that during an ER visit on May 10, 2018 for gynecological complaints, Plaintiff had normal gait and station, normal range of motion in her neck and musculoskeletal system, normal muscle strength, normal muscle tone, and intact neurovascular function. At that time, Plaintiff denied neck, thoracic, lumbar, and hip pain, and her gait, strength, and range of motion were normal. The ALJ remarked that Plaintiff's treating providers "noted pain medication gave [Plaintiff] some relief but they observed she was 'serially requesting additional pain medications in the ER despite no obvious distress' and she was ambulatory in the ER without splinting or abnormal gait."

The ALJ next discussed Plaintiff's May 24, 2019 emergency room visit, where she complained of back pain at a "ten" on a ten-point scale, claimed that walking for three minutes made her symptoms worse, and requested more pain medication. The ALJ noted that despite these complaints, Plaintiff appeared in no acute distress and had normal neck inspection, gait, station, range of motion, strength, tone, and sensation, as well as no foot drop. Additionally, Plaintiff had normal motor function and activity, normal sensory function, intact nerves, equal grip strength, no focal deficits, and no lateralizing signs. The ALJ documented that Plaintiff reported improvement after receiving pain medication and, although her treaters ordered an MRI to investigate her complaints, she chose to leave the hospital against medical advice.

On August 4, 2019, Plaintiff was again seen in the ER for an "[i]intentional drug overdose" after she took more than her prescribed dose of pain medication. At that time, she was noted to be well-appearing and in no distress, with normal range of motion in all major joints and no pain to palpation. The ALJ noted this ER visit and another in September 2019, during which Plaintiff

complained of chronic back pain that was not being adequately managed, but appeared in no acute distress.

On September 23, 2019, Plaintiff established care with Dr. Benjamin Cook, a family practitioner, to whom she reported a history of back pain, fibromyalgia, and numbness and pain in her hands and arms.  Plaintiff reported no neck pain or stiffness, and her range of motion was normal in all joints.  Dr. Cook's notes from that visit state that Plaintiff's "MRI showed that L4-L5 had mild degenerative disc disease and grade 1 anterolisthesis with moderate facet arthropathy resulting in moderate central canal stenosis with moderate left and mild foraminal . . . narrowing." Regarding Plaintiff's fibromyalgia, Dr. Cook recommended physical exercise, physical therapy, and various stress relief methods, including medication—he continued Plaintiff on Lorazepam and added Zoloft for her anxiety.

The ALJ recounted at length Plaintiff's treatment by spine specialists, surgeons, and pain-management specialists starting in October 2019, after establishing primary care with Dr. Cook. The ALJ noted that on October 22, 2019, orthopedic surgeon Dr. Jeff Lehman found Plaintiff to be in no apparent distress despite her assertion of pain in her neck and back at a "nine" on a ten-point scale, though he did observe her to have decreased range of motion in her neck and reduced strength (4+/5) in her quadriceps.  Dr. Lehman diagnosed Plaintiff with acquired spondylolisthesis. The ALJ documented that late at night on the same day, Plaintiff again went to the ER complaining of pain radiating into her lower extremities, but her neck, musculoskeletal, and neurological exams were all normal.  Plaintiff was given one shot of Toradol and one hydrocodone in the ER, and prescribed a course of prednisone and tramadol to be taken for the pain pending follow-up with a back surgeon, pain management, and her primary care physician.

Plaintiff did pursue follow-up care with a pain-management physician assistant, who documented similar pain complaints and some tenderness and loss of range of motion in the neck and back, but found that despite her pain complaints, Plaintiff presented in no apparent distress. As noted by the ALJ, the pain specialist diagnosed cervical radiculitis and directed Plaintiff to return for a cervical steroid injection on November 1, 2019.  Plaintiff did not return on November 1, but instead met with a different pain specialist for that injection on November 6, 2019.

Also on November 6, 2019, Plaintiff discussed surgery with Dr. Lehman.  The ALJ noted that the following week, Plaintiff complained of increased pain with walking and standing, and that Dr. Lehman again assessed decreased range of motion in the neck and back and 4+/5 lower extremity strength, diagnosed acquired spondylolisthesis and spinal stenosis, and recommended lumbar fusion surgery.  At that time, surgery was planned for December 12, 2019.

The ALJ noted that on December 4, 2019, Plaintiff presented to the emergency room complaining of a back-pain flare up and seeking pain relief medication.  Plaintiff reported diffuse low back pain radiating into her right upper buttocks and the back of her leg and, although surgery was planned for the following week, she complained that Dr. Lehman did "not seem to be helpful." Plaintiff was administered morphine, prescribed Vicodin and Flexeril, advised to increase her gabapentin, and informed that any further pain medication should come from her treating pain-management physician.

The ALJ recorded that on December 10, 2019, Plaintiff returned to Dr. Cook for preoperative clearance.  Dr. Cook reviewed her testing showing "mild" degenerative disc disease at the L4-L5 level and "moderate" central canal stenosis with moderate left and mild foraminal narrowing.  The ALJ noted that Dr. Cook told Plaintiff that she had missed several appointments and that if she continued to miss, she would no longer be seen.  Dr. Cook found Plaintiff to have

normal, full range of motion in all joints but noted that surgery would be necessary and suggested lumbar and cervical spine workup.

Plaintiff was then referred for an evaluation of abdominal complaints before being cleared for surgery.  The consulting surgeon noted Plaintiff's history of multiple abdominal complaints since her hysterectomy in 2017, and recommended that she undergo further abdominal evaluation prior to spinal fixation because "putting her through another abdominal surgery [could] complicate her picture postoperatively and make it very difficult to accurate diagnose and treat her symptoms." The ALJ noted that on December 17, 2019, Plaintiff was in the ER again due to issues unrelated to her severe impairments.  At that time, she appeared in no distress.

On January 2, 2020, Plaintiff reported to Dr. Cook that her back surgery had been postponed because she needed to address and heal from internal abdominal hernias before a surgeon could approach anteriorly to operate on her lumbar spine.  Plaintiff asked for pain medication and was given a seven-day prescription for hydrocodone-acetaminophen pending follow-up with pain management.  The ALJ noted that Dr. Cook suggested several tests and made conservative recommendations; he did not document a musculoskeletal exam.

On January 13, 2020, Dr. Cook examined Plaintiff and completed a medical source statement on her behalf, in which he opined on her limitations due to her physical and mental impairments.  His exam notes from that date document Plaintiff's reports of back pain and decreased range of motion, but contain no exam findings regarding Plaintiff's back and also state that Plaintiff was experiencing no neck pain or stiffness and had normal range of motion in her neck.  Plaintiff's hobbies were noted to be exercise and yard work.  Dr. Cook recommended follow-up with a spine surgeon.

In his medical source statement, Dr. Cook first noted Plaintiff's degenerative disc disease of the neck and lumbar spine, and he stated that she has decreased range of motion.  He then indicated his belief that she can never lift or carry 50 pounds, rarely lift or carry 20 pounds, and occasionally lift or carry ten pounds.  Dr. Cook opined that Plaintiff can never crawl or climb, rarely twist and crouch, and occasionally stoop and balance.   He indicated that Plaintiff is able to sit for 30 minutes at a time before needing to change positions and for less than two hours total in an eight-hour workday, and that she can stand for 20 minutes at a time before needing to sit and for less than two hours total per workday.  Dr. Cook further opined that Plaintiff needs to be able to shift positions at will from sitting, standing, or walking, and that she requires 15-to-20-minute breaks once an hour.  He stated that Plaintiff needs to elevate her legs to heart level for ten percent of her workday due to lumbar stenosis causing claudication.  Dr. Cook opined that Plaintiff's condition will cause her to have good days and bad days, that she can tolerate only low-stress work, that she is likely to be off-task 25 percent of each workday, and that she will miss work approximately four days per month.   Although Dr. Cook indicated "see attached files," no additional records are attached to his medical source statement.

Plaintiff completed a function report in February 2019 in which she described limitations on her activities of daily living due to pain.  At that time, Plaintiff's husband, who is now deceased, was suffering from cancer.  Plaintiff wrote that her husband needed a home health aide because she could not bathe or dress him or prepare meals; she stated that she could not cook full meals due to pain with standing and that it took her fifteen minutes to make a sandwich.  Plaintiff stated that she also needed assistance with cleaning her home, and reported that due to pain with sitting and bending, she had difficulty dressing, bathing, shaving, and toileting.  Plaintiff stated that she did laundry and dishes only once a week, that doing laundry took her all day, and that she needed

help with carrying and folding clothing.  She wrote that she was unable to do yardwork.  While Plaintiff indicated being able to drive, she reported going only to the grocery store and medical appointments.  Plaintiff checked boxes indicating that her pain affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs.  She wrote that she could only "walk[] a few feet then stop, rest then walk again. . . . [O]nly sit for a little while then I will walk then sit back down."  Plaintiff indicated that she occasionally uses a cane.

At the March 2020 hearing before the ALJ, Plaintiff testified that in 2018, she resigned from her last job as a housekeeper at a nursing home because she had carpal tunnel surgery on her wrists and also began having a lot of back and neck issues.  She stated that since resigning from that job, she has been unable to return to cleaning work due to needing breaks to sit down and her clients complaining about her unsatisfactory performance.  Plaintiff testified that her back pain radiates down her right side to the back of her leg, while her neck pain radiates into her shoulders, arms, and fingers, causing her difficulty with grabbing and lifting.  As to her activities of daily living, Plaintiff testified that she has difficulty caring for herself—she stated that she can only be on her feet for 20 to 30 minutes at a time, and that it takes her eight hours to complete a load of laundry or do the dishes due to needing breaks.  Plaintiff testified that she elevates her feet to heart level while resting, and that on bad days, which occur four times per week, she stays in bed.

**B.      The ALJ's Review of the Evidence Regarding Plaintiff's Neck and Back Complaints Demonstrates that She Did Not Overlook a Substantial Limitation**

As described above, the ALJ discussed and examined Plaintiff's back and neck pain and the course of her treatment for that pain at length over more than four single-spaced pages of her decision.  The Court finds that based on the foregoing detailed examination of the medical evidence relating to Plaintiff's neck and back complaints, which she contends limit her ability to sit, stand,

and walk, the ALJ has not overlooked a substantial limitation despite not performing a function-by-function analysis of Plaintiff's abilities.

> Where, as here, [the Court] can follow the adjudicator's reasoning in conducting [its] review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.  In conducting [its] review, [it] should, indeed must, exercise common sense. . . .  [The Court] cannot insist on technical perfection.[20]

"Plaintiff's argument that the ALJ was required to perform more of an analysis is premised on the notion that she is more limited than the ALJ found her to be."[21]  As discussed further below, however, Plaintiff has not come forward with persuasive medical evidence showing that her impairments prevent her from working consistent with the ALJ's RFC.[22]  Thus, the Court concludes that the ALJ's failure to conduct a function-by-function analysis is harmless error and does not warrant remand to the ALJ for further analysis.

## C.     The ALJ Did Not Err in Finding Dr. Cook's Medical Source Statement Unpersuasive

New regulations promulgated in 2017 govern the consideration of medical opinions for claims, such as this one, filed on or after March 27 of that year.[23]  Under the new rules, the SSA does "not defer or give any specific evidentiary weight, including controlling weight, to any

---

[20] *Hendron v. Colvin*, 767 F.3d 951, 957 (10th Cir. 2014) (quoting *Keyes–Zachary v. Astrue,* 695 F.3d 1156, 1166 (10th Cir. 2012)); *see also Bowman v. Colvin*, 2015 WL 5032044, at *6 (D. Kan. 2015).

[21] *Newberry v. Colvin*, 2015 WL 4946319, at *11 (D. Kan. 2015).

[22] *See, e.g., Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Cox v. Berryhill*, 2018 WL 3575648, at *3 (D. Kan. 2018) ("[A]lthough Plaintiff asserts a technical error in the ALJ's failure to state the sitting, and standing and/or walking requirements of sedentary work, she does not point to record evidence that she cannot meet those requirements. Therefore, even if the court were to assume an error in this regard, Plaintiff has shown no prejudice resulting from the alleged error.").

[23] *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5,844-01, 2017 WL 168819 (SSA Jan. 18, 2017); 20 C.F.R. § 404.1520c; *Monique M. v. Saul*, 2020 WL 5819659, at *6 (D. Kan. 2020).

medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."[24]   Rather, "the SSA has rejected determining relative weights of opinion evidence in favor of assessing the persuasiveness of a source's opinions."[25]   The ALJ must apply the requirements of 20 C.F.R. § 404.1520c(c)(1)-(5) in evaluating the persuasiveness of medical opinions, specifically taking into account supportability, consistency, relationship with the claimant, specialization, and other factors.[26]   However, the ALJ need only articulate how she considered the two most important factors—the supportability and consistency of the opinion.[27]

Thus, the standard for evaluating medical opinions under the new rules "is not a hierarchical evaluation of the various medical sources under the treating physician rule, but it is whether the ALJ properly applied the regulations to determine the persuasiveness of the evidence based primarily on the supportability and consistently factors as applied to that evidence."[28]   On appeal, this Court must examine

> the ALJ's rationale for finding the medical opinions persuasive or unpersuasive and determine whether it is supported by such relevant record evidence as a reasonable mind might accept as adequate to support a conclusion.   If so, the ALJ's rationale must be accepted except when the evidence *compels* a different finding.   That the record evidence might also *support* a different finding is irrelevant.[29]

---

[24] 20 C.F.R. § 404.1520c(a).

[25] *Monique M.*, 2020 WL 5819659, at *6.

[26] *Victoria Jean G. v. Kijakazi*, 2021 WL 4168124, at *4 (D. Kan. 2021) (citing 20 C.F.R. § 404.1520c(c)(1)-(5)).

[27] *Id.* at *4, 6 (citing 20 C.F.R. § 404.1520c(b)(2)).

[28] *Monique M.*, 2020 WL 5819659, at *6.

[29] *Victoria Jean G.*, 2021 WL 4168124, at *5.

The ALJ found Dr. Cook's opinion regarding Plaintiff's limitations, which if accepted would prelude competitive employment, to be unpersuasive.  Specifically, the ALJ noted that despite Dr. Cook opining that Plaintiff would need 15-to-20-minute unscheduled breaks hourly throughout the workday due to pain and muscle weakness, he did not state that Plaintiff needs a cane or other assistive device.  Further, the ALJ noted that the only support Dr. Cook provided for his extreme opinion was to note Plaintiff's diagnoses and subjective pain complaints.  "With regard to actual findings for support, he simply stated she had 'decreased' range of motion without specificity and then cited to 'attached files' but they are not attached."  Critically, regarding the consistency of Dr. Cook's opinion, the ALJ found it inconsistent with other treatment notes, including his own, because neither he nor any other treater had previously found claudication or suggested a medical need to elevate Plaintiff's legs.

The ALJ has provided rationale for rejecting Dr. Cook's opinion that is based on relevant evidence of record, including evidence regarding the supportability and consistency of his opinion, and the Court finds that a reasonable mind might accept this evidence as adequate to support the ALJ's conclusion.  The Court finds no error in the ALJ's failure to find Dr. Cook's opinion persuasive.

**D.    The ALJ's Determination of Plaintiff's Credibility Is Supported by Substantial Evidence**

The ALJ found that while Plaintiff has a number of challenges in her life, a longitudinal review of her treatment history documents conservative treatment only, which is at odds with Plaintiff's allegations, and that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence of record.   The Commissioner argues, and the Court agrees, that the ALJ's very detailed

discussion of Plaintiff's treatment and examination findings support the ALJ's RFC determination of light work with additional postural limitations despite Plaintiff's claims of more disabling limitations.

"Because the ALJ's 'credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined.'"[30] "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence.[31] Recognizing that "some claimants exaggerate symptoms for the purposes of obtaining government benefits,"[32] an ALJ's credibility determinations are generally treated as binding on review.[33] The Court cannot displace the ALJ's choice between two fairly conflicting views even though the Court may have justifiably made a different choice.[34] However, notwithstanding the deference generally given to an ALJ's credibility determination, adverse "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."[35]

In evaluating a disability claim based on nonexertional symptoms, including pain, the ALJ must first determine whether the objective medical evidence demonstrates that a claimant suffers

---

[30] *L.T.O. v. Kijakazi*, 2021 WL 4709929, at *4 (D. Kan. 2021) (quoting *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009)).

[31] *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (citation omitted); *see Hackett*, 395 F.3d at 1173.

[32] *Bolan v. Barnart,* 212 F. Supp. 2d 1248, 1260 (D. Kan. 2002) (citing *Frey v. Bowen,* 816 F.2d 508, 517 (10th Cir.1987)).

[33] *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990) (citing *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988)).

[34] *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

[35] *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1995)).

from an underlying medically determinable physical or mental impairment.[36]  If so, the ALJ must consider the relationship between the impairment and the alleged nonexertional limitation.[37]  If a loose nexus exists, the ALJ must then consider all the evidence, both objective and subjective, in determining whether a claimant's limitation is disabling.[38]   Factors that may be relevant in assessing the claimant's testimony include:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or non-medical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of non-medical testimony with objective medical evidence.[39]

Under SSR 16-3p, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."[40]

Here, the ALJ found that Plaintiff had satisfied the first two steps in the analysis—she stated that Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms.  The ALJ then determined, however, that Plaintiff's statements about her symptoms were not entirely credible based on evidence relating to Plaintiff's largely

---

[36] *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987).

[37] *Id.* at 164.

[38] *Id*. at 164-65.

[39] *Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993) (quotation marks and citation omitted); *see* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii); *Luna*, 834 F.2d at 165-66.

[40] *Brownrigg v. Berryhill*, 688 F. App'x 542, 546 (10th Cir. 2017) (quoting SSR 16-3p, 2016 WL 1119029, at *9 (2016)).

normal examination findings (including normal gait and station, largely normal range of motion of the neck and musculoskeletal system, normal or only mildly abnormal strength, normal muscle tone, and intact neurovascular function); the lack of persuasive medical evidence concerning functional limitations on her activity; Plaintiff's inconsistent claims of pain and numerous findings that she was in no apparent distress despite claiming to be in excruciating pain; Plaintiff's failure to follow up on recommended treatment; Plaintiff's attempt to start a business; her hobbies of exercise and yardwork as stated in the medial records; and her frequent presentation at health care providers requesting pain medications.  Notably, although the ALJ does not expressly refer to Plaintiff as a drug-seeker, her opinion is replete with references to such behavior, which an ALJ may properly consider when evaluating a claimant's credibility.[41]  And although the Commissioner concedes that the ALJ did not expand upon Plaintiff's activities of daily living when finding that they are not as limited as would be expected given Plaintiff's allegations, the ALJ adequately states throughout her detailed, lengthy opinion the evidence she relied upon in finding Plaintiff's allegations of disabling pain not entirely credible.[42]

Although the court in *Luna* provided a list of factors for an ALJ to consider in assessing a claimant's testimony, this list is not exhaustive.[43]  Furthermore, the courts do not require the ALJ

---

[41] *Poppa*, 569 F.3d at 1171-72.

[42] *See Pickup v. Colvin*, 606 F. App'x 430, 432-33 & n.1 (10th Cir. 2015) (finding ALJ did not err in credibility analysis even where two aspects of that analysis were mistaken, and rejecting claimant's argument that a court may not affirm an ALJ's credibility finding while rejecting some reasons for that finding) (quoting *Branum v. Barnhart*, 385 F.3d 1268, 1274))).  Further, the Tenth Circuit has held that the lack of objective verification of activities of daily living is a factor that may be considered when assessing the credibility of a claimant's testimony as to her limitations.  *Keyes-Zachary*, 695 F.3d at 1168; *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009); *Pickup*, 605 F. App'x at 434.

[43] *Luna*, 834 F.2d at 166.

to take a formalistic factor-by-factor approach in making a credibility determination.[44]   Instead, the ALJ is only required to set forth the specific evidence she relies on in evaluating the claimant's credibility.[45]   Here, the Court finds that the ALJ's determination as to Plaintiff's credibility is more than adequately tied to substantial evidence.   The ALJ articulated specific reasons for finding Plaintiff not fully credible, and these reasons are supported by substantial evidence in the record. As stated above, the Court will not reweigh the evidence or substitute its own judgment for that of the ALJ.[46]   Plaintiff has not come forward with persuasive evidence showing that her impairments prevent her from working consistent with the ALJ's RFC, and the ALJ's decision must be affirmed.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner is **AFFIRMED**.

**IT IS SO ORDERED.**

Dated this 22nd day of March, 2022.

This case is closed.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[44] *Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir.2000).

[45] *Id.*

[46] *Hackett*, 395 F.3d at 1173.